<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION AT CLEVELAND

 3

 4   UNITED STATES OF AMERICA,    *       CASE NO. 1:23-cr-535
                                  *
 5            Plaintiff,          *
                                  *
 6        vs.                     *       OCTOBER 4, 2023
                                  *
 7   DANIEL KOVACIC,              *
                                  *
 8            Defendant           *
                                  *
 9

10

11              TRANSCRIPT OF DETENTION PROCEEDINGS
           HELD BEFORE THE HONORABLE JONATHAN D. GREENBERG
12                 UNITED STATES MAGISTRATE JUDGE

13

14   APPEARANCES:

15
     For the Plaintiff:            Brian S. Deckert, AUSA
16

17   For the Defendant:            John P. Luskin, Esq.

18
     Probation Officer:            Alex Torres
19

20
     Transcriber:                  Lance A. Boardman, RDR, CRR
21                                  United States District Court
                                    801 West Superior Avenue
22                                  Court Reporters 7-189
                                    Cleveland, Ohio 44113
23                                  216.357.7019

24   Proceedings recorded by mechanical stenography from a
     digital audio recording; transcript produced by
25   computer-aided transcription.
</pre>

1                    (In open court at 2:07 p.m.)

2                    THE COURTROOM DEPUTY:  Your Honor, the case

3        before the Court today is 1:23-cr-535, the United States of

4        America vs. Daniel Kovacic.

5                    THE COURT:  Good afternoon.

6             On behalf of the United States?

7                    AUSA DECKERT:  Good afternoon, Your Honor.

8             Brian Deckert on behalf of the United States.  Seated

9        with me at counsel's table is Lane Thorum from the Federal

10       Bureau of Investigation.

11                   THE COURT:  On behalf of the defendant?

12                   ATTORNEY LUSKIN:  Good afternoon, Your Honor.

13            John Luskin on behalf of Daniel Kovacic.  Thank you.

14                   THE COURT:  Sir, you are Daniel Kovacic?

15                   THE DEFENDANT:  Yes, Your Honor.

16                   THE COURT:  Good afternoon.

17                   THE DEFENDANT:  Good afternoon.

18                   THE COURT:  We're here today for a scheduled

19       detention hearing.

20            Mr. Deckert, please state for the record the charges

21       and penalties.

22                   AUSA DECKERT:  Your Honor, Mr. Kovacic was

23       charged in a one-count indictment alleging a violation of

24       Title 18 of the United States Code Sections 922(g)(1) and

25       924(a)(8).  It's entitled felon in possession of a firearm.

1          It's punishable by a maximum term of imprisonment of

2     15 years, a maximum fine of up to $250,000, a maximum period

3     of supervised release of three years, and a $100 special

4     assessment.

5               THE COURT:  Is this a presumption matter,

6     Mr. Deckert?

7               AUSA DECKERT:  No, it is not, Your Honor.

8               THE COURT:  Mr. Kovacic, you have a

9     Constitutional right to be represented by an attorney at

10    every stage of these proceedings.  If you're unable to

11    afford an attorney, the Court will appoint one at no cost to

12    represent you.

13        Sir, do you understand your right to an attorney?

14              THE DEFENDANT:  I do, yes, Your Honor.

15              THE COURT:  Sir, you also have a right to

16    remain silent.  You're not required to make a statement, and

17    anything you say may be used against you.  If you start to

18    make a statement, you may stop at any time.  You may also

19    consult with your attorney, Mr. Luskin, at any time.

20        Do you understand your right to remain silent?

21              THE DEFENDANT:  Yes, Your Honor, I do.

22              THE COURT:  And as it relates to your

23    attorney, I want to make clear that you have previously been

24    appointed to be represented by Attorney John Luskin.

25              Is that correct?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Very well.

3     And Mr. Luskin, do you confirm the United States was

4 advised of their obligations under the Due Process

5 Protections Act on September 27, 2023?

6          ATTORNEY LUSKIN:  I shall do so and confirm,

7 Your Honor.

8          THE COURT:  Very well.

9     On behalf of the United States?

10          AUSA DECKERT:  Your Honor, the United States

11 would proffer two things for the Court's consideration and

12 then reserve for argument.

13     First, the United States would proffer the Pretrial

14 Services report that is authored in this case and the

15 Government's memorandum in support of pretrial detention and

16 the accompanying exhibit.

17          THE COURT:  Which were previously filed with

18 the Court?

19          AUSA DECKERT:  Yes, Your Honor, on September

20 28 of 2023.

21          THE COURT:  Would you like to give me the

22 facts of this case?

23          AUSA DECKERT:  Yes, Your Honor.

24     Your Honor, as set forth in the Government's

25 memorandum, the charge that was indicted by the grand jury

1    is simply felon in possession of firearm and ammunition.

2    However, the surrounding facts that led to that indictment

3    are a little bit more involved.

4         In this case, there was a call to the Wickliffe Police

5    Department on August 17 of 2023 at approximately 4:10 p.m.

6    Neighbors had reported hearing gunshots in the area.

7         And, Your Honor, just for your -- to paint a picture

8    of this complex, it's an apartment complex of side-by-side

9    units with front doors, and the units share common walls.

10   And it's -- there are brick exteriors.

11        So because there are so many individuals living in

12   residence in the area, there were multiple calls to 911 from

13   the residents.

14        Police did arrive.  They spoke to some neighbors.  One

15   neighbor identified that it came from ███ Ridgewick, which

16   turned out to be the defendant's apartment.  And they took

17   up a position, a perimeter, and surrounded that area.

18        They spoke to a number of neighbors who reported

19   essentially the same, hearing gunshots, several, two to

20   three approximately.  And one neighbor indicated that he had

21   a confrontation a couple weeks earlier with Mr. Kovacic

22   during which Mr. Kovacic pulled a weapon, pointed it at him

23   with a laser that was pointed at his chest.

24        The police did attempt to make contact with

25   Mr. Kovacic numerous times through cell phone, text

1     messages, a PA system.  Mr. Kovacic's girlfriend, Kelly

2     Siebert, she exited the house and they did speak with her.

3     She did say he was in there and that she left him asleep on

4     the couch.

5          She reported that she did see a firearm in the

6     residence a couple weeks earlier when cleaning.  And on this

7     date she noted that he was -- seemed to be a little bit

8     agitated, that he was speaking with his boss, and that it

9     appeared that he may have lost his job and that he may have

10    been under the influence of alcohol.  She did see some cans

11    around in the area.  She did not report hearing any

12    gunshots.

13         Eventually, the police were able to make contact with

14    Mr. Kovacic after many hours.  They saw him in the window

15    and asked -- ordered him to come down and he did.  And he

16    was taken into custody without incident.

17         All the neighbors did have to be evacuated from their

18    apartments while this was going on.

19         Police spoke with his mother and father who reported

20    some concern for his well-being and safety.

21              THE COURT:  I think that you've answered my

22    question as it relates to the incident.

23              AUSA DECKERT:  Yes, Your Honor.

24              THE COURT:  The rest I can certainly read in

25    your brief.

1          AUSA DECKERT:  Okay.  Thank you, Your Honor.

2          THE COURT:  Anything further on behalf of the

3    United States for proffer or witnesses?

4          AUSA DECKERT:  No, Your Honor.

5          THE COURT:  Mr. Luskin, anything to proffer or

6    any witnesses on behalf of the defendant?

7          ATTORNEY LUSKIN:  No, Your Honor, just a

8    proffer with respect to that.

9        In the totality of the circumstances, what Mr. Deckert

10   has indicated is factually correct.

11         THE COURT:  Mr. Luskin, I'm going to give you

12   full opportunity to argue.  If you want to proffer facts,

13   you may proffer facts.

14         ATTORNEY LUSKIN:  I'm just going to proffer,

15   Your Honor, that --

16         THE DEFENDANT:  Your Honor, I would like to

17   talk to my attorney be -- I don't -- oh, okay.

18              (Crosstalk.)

19         THE COURT:  Excuse me.

20         ATTORNEY LUSKIN:  Nothing to proffer at this

21   time, Your Honor.  We will argue.

22         THE COURT:  We'll give you white noise.

23         ATTORNEY LUSKIN:  Thank you.

24              (Attorney-client conference.)

25         THE COURT:  Anything to proffer, Mr. Luskin?

1          ATTORNEY LUSKIN:  No, Your Honor.

2               THE COURT:  Counsel approach, please.

3               (Off-the-record discussion at side bar.)

4               THE COURT:  Very well.

5          Argument for incarceration on behalf of the United

6     States?  Or detention.  Excuse me.

7               AUSA DECKERT:  Yes, sir.

8          Your Honor, may I use the podium?

9               THE COURT:  You may.

10              AUSA DECKERT:  Your Honor, as you've already

11    indicated, this is a case that does not involve a

12    presumption of detention, meaning that the Government must

13    prove by clear and convincing evidence that Mr. Kovacic is

14    either a danger to the community or by a preponderance of

15    the evidence that he's a risk of flight.  And the code sets

16    forth the various things that the Court must examine to

17    determine that, and those are set forth in 3142.

18         Essentially, the nature and circumstances of the

19    underlying offense --

20              THE COURT:  Let's discuss each one as you

21    recite them.

22              AUSA DECKERT:  Yes, Your Honor.

23              THE COURT:  The nature and circumstances of

24    the offense are such that he is charged with a

25    nonpresumption possession of -- being a felon in possession.

1    Is that correct?

2                    AUSA DECKERT:  Yes, Your Honor.  Pursuant to

3    3142(f)(1), an offense that involves a firearm or

4    destructive device.

5                    THE COURT:  We don't -- this is argument, so

6    you don't need to recite the statute to me.

7                    AUSA DECKERT:  Yes, Your Honor.

8                    THE COURT:  Tell me why that would lean

9    towards detention, that factor.  Any reason that factor

10   would?

11                   AUSA DECKERT:  Yes, Your Honor, I believe it

12   would.  I mean, the statute itself sets forth that the fact

13   that it involves a firearm is -- under the nature and

14   circumstances of the offense is something that the Court

15   would consider as far as detention because it does

16   necessarily go to risk of danger.

17                   THE COURT:  What's the next factor?

18                   AUSA DECKERT:  Your Honor, the history and

19   characteristics of the defendant.  And that's -- again,

20   you're looking at the person's character, physical and

21   mental condition, family ties, employment, financial

22   resources, length of residence in the community, community

23   ties, past conduct, history relating to drug and alcohol

24   abuse.

25                   THE COURT:  So of all those, the one that I

1    would assume the Government wants to discuss would be his

2    criminal record.  Is that a fair statement?

3                    AUSA DECKERT:  His criminal record and mental

4    condition and --

5                    THE COURT:  So what evidence is there of

6    issues with his mental condition?

7                    AUSA DECKERT:  Your Honor, what was set forth

8    in the Government's memorandum and proffer for this Court's

9    consideration is that there was reports that he had been

10   suffering from some increased paranoia over the last couple

11   weeks that led up to this incident, that he sent some

12   disturbing messages relating to violence and threats of

13   violence against others, and that there's some indication

14   that he was abusing steroids, anabolic steroids, at the

15   time, as well as controlled substances, cocaine, and

16   alcohol.

17        So all those things, the mental condition, the history

18   of drug use, alcohol abuse, these are all things that are

19   listed as factors that the Court can consider in history and

20   characteristics, Your Honor.

21        And the fact that -- I guess lack of employment is

22   also another condition that -- in history and

23   characteristics that the Court must consider.  What the

24   Government has at this time is that he had lost his job on

25   the date of this incident.

1              THE COURT:  Okay.  What's the next factor?

2              AUSA DECKERT:  The record concerning

3     appearances at court proceedings and history of

4     nonappearance.

5         Your Honor, I would point to -- the defendant served a

6     lengthy criminal sentence, and what led to that lengthy

7     criminal sentence were some -- three convictions, and the

8     first being an assault on a peace officer which he was given

9     a bond on.  While on bond, he picked up a drug possession

10    charge, was given bond on that as well.  And on both -- when

11    on bond for both of those cases, he picked up a felonious

12    assault and then ultimately was convicted of all three.

13             THE COURT:  In the midst of that there was a

14    capias issued; is that correct?

15             AUSA DECKERT:  Yes, Your Honor.  I think that

16    the --

17             THE COURT:  And this occurred in 2009; is that

18    correct?

19             AUSA DECKERT:  Yes, Your Honor.  He was --

20             THE COURT:  Okay.  Next issue.

21             AUSA DECKERT:  He was then sentenced to --

22             THE COURT:  Next issue.

23             AUSA DECKERT:  Okay.

24             THE COURT:  So he has a failure to appear in

25    2009, okay, so I'm not putting a lot of credit onto that.

1          What else?

2                    AUSA DECKERT:  Well, Your Honor, I would just

3      say this:  He received 145 months, so the fact that 2009 is

4      the last time, that's because he's been in prison this whole

5      time.

6                    THE COURT:  Go ahead.

7                    AUSA DECKERT:  Okay.  Your Honor, I believe

8      those are all the factors that are appropriate in this case

9      and that the Government would point this Court to.

10                    THE COURT:  So when did he get released?

11                    AUSA DECKERT:  He was released early and then

12      placed on community control.

13                    THE COURT:  When did he get released?

14                    AUSA DECKERT:  The motion for initial release

15      was granted on January 23 of 2020.

16                    THE COURT:  And he was sentenced on 5/24/20,

17      so he did close to 10 years.

18                    AUSA DECKERT:  Yes, Your Honor.

19                    THE COURT:  And so he's been without any issue

20      until April of '23, so three years?  He had a disorderly --

21                    AUSA DECKERT:  Yes.

22                    THE COURT:  -- in Willoughby Municipal Court?

23                    AUSA DECKERT:  Yes, Your Honor.

24                    THE COURT:  Okay.  What's the next issue?

25                    AUSA DECKERT:  Your Honor, the -- another

1    issue relates to dangerousness, danger to the community.

2         I will point out that when police did do a search

3    warrant of his home, they found two different calibers of

4    ammunition in his house.  The firearm that they seized was a

5    380, but they also found an additional magazine containing

6    9 millimeter ammunition as well as multiple rounds scattered

7    of 9 millimeter.

8         They did find a safe in his house that the Wickliffe

9    Police were unable to open.

10        They did search the rest of the residence and did not

11   find any 9 millimeter weapon.

12        Now, I can't stand here and say I know that there's a

13   weapon in that safe.  All I'm saying is --

14                    THE COURT:  Then don't.

15                    AUSA DECKERT:  No, I'm not.

16                    THE COURT:  Next factor.

17                    AUSA DECKERT:  I understand, Your Honor.  But

18   I would say that the fact that there is indication of

19   another weapon --

20                    THE COURT:  I understand you found two

21   calibers of ammunition and one weapon.  I get it.

22                    AUSA DECKERT:  Yes.

23        Your Honor, I believe I've touched upon all the

24   factors that we think are appropriate.

25                    THE COURT:  All right.  Anything else to argue

1    on behalf of the United States as relates to detention?

2              AUSA DECKERT:  No, Your Honor.  Thank you.

3              THE COURT:  Thank you, Mr. Deckert.

4         Mr. Luskin.

5              ATTORNEY LUSKIN:  Thank you, Your Honor.

6         Your Honor, as indicated, there is no presumption for

7    detention in this matter.  And with respect to all of the

8    factors, with respect to having Mr. Kovacic not in

9    detention, is that at the particular juncture, what the

10   Government has outlined with respect to this matter, was the

11   fact that he did lose his job -- he did lose his job on that

12   particular day, he did drink heavily.  And the police

13   reports indicated he fired two to three gunshots into the

14   air, not posing any risk of harm, much like many people do

15   on New Year's Eve.

16        He did go into the house at that particular point in

17   time.  Ms. Kelly Siebert, who was present --

18              THE COURT:  Is he supposed to have a gun?

19              ATTORNEY LUSKIN:  He's not supposed to have a

20   gun, Judge.

21              THE COURT:  So is he supposed to be firing a

22   gun that he's not supposed to have?

23              ATTORNEY LUSKIN:  He's not supposed to be

24   firing a gun, he's not supposed to have that gun.  But as

25   the State charged, it was having a weapon under disability,

1    a felony 3, and discharging a firearm in the city limits,

2    which is a misdemeanor of the first degree, and inducing

3    panic, which is a low-level felony of the fifth degree.

4    Those were the charges that were brought by the Wickliffe

5    Police Department in the County of Lake in the Willoughby

6    Municipal Court at that particular point in time.

7         Judge, those are lower-level felonies in the state

8    court.  And I'm not going to demean the seriousness of the

9    charges here in this particular court, but certainly it's

10   not a crime of violence at that particular point in time.

11                   THE COURT:  He's looking at 15 years in this

12   court.

13                   ATTORNEY LUSKIN:  15 years, Your Honor.

14   Judge, I understand that's the second factor that the Court

15   must consider with respect to that.

16        But, again, he has -- with respect to his time that

17   he's served, he did serve his time, he did get judicial

18   release, and he was terminated early from that judicial

19   release with respect to the good behavior that he had.

20        He is gainfully and was gainfully employed at Weed

21   Lawn, one of their top salesmen.  He had started drinking

22   which he had not done for some period of time.  And the

23   family does have a history of alcoholism in their family.

24   He is well aware of that, because immediately after these

25   allegations came up in Wickliffe, he got together with some

1    people in AA and he was doing 90 meetings in 90 days.

2         He is a standing member of the Knights of Columbus of

3    Our Lady of Mount Carmel.  He has the support of the mayor

4    of Wickliffe who is also a fellow Knight with him, as is the

5    service director of the City of Wickliffe.  They have

6    letters of support and things of that that go on with Dan as

7    to his character with respect to that.

8                   THE COURT:  Do you have any support people in

9    any 12-step programs, AA, anything like that?  The Knights

10   of Columbus is a great organization.  That's not --

11                  ATTORNEY LUSKIN:  With AA --

12                  THE COURT:  Let me --

13                  ATTORNEY LUSKIN:  Yes, he does, Your Honor.

14   He has --

15                  THE COURT:  May I finish my question?

16                  ATTORNEY LUSKIN:  Yes, Your Honor.

17                  THE COURT:  I'm more concerned about the

18   people that are helping him with some of his issues as

19   opposed to the service organization he's in.

20                  ATTORNEY LUSKIN:  Judge, he is -- he was doing

21   90 meetings in 90 days.  He was seeking out a sponsor and a

22   home group.

23         And again, if the Court is so inclined, he could put a

24   TAD monitor on him that would monitor any abuse of alcohol

25   and refrain from any use of alcohol at that particular point

1     in time.  That is a factor that this Court can consider to

2     ensure that he will not use alcohol.

3          And with the Probation Department, he will be drug

4     tested on a daily basis if need be, that he will not be

5     using cocaine.  He did admit to that, but he has been able

6     to put that away and try to stay and maintain sobriety with

7     respect to that.

8          With respect to being a flight risk, Judge, there's no

9     indication that he could ever be a flight risk because he

10    was out on a $50,000 bond in the matter in Willoughby

11    Municipal Court.  And on the date that he was picked up on

12    this federal indictment he had reported to court, and when

13    he checked in with the clerk's office on the first floor, I

14    believe Mr. Michael Jenovic was the officer that was there

15    for the court there, and he was taken into custody by the

16    members of the Federal Bureau of Investigation.

17               THE COURT:  Let me ask you this, Mr. Luskin.

18               ATTORNEY LUSKIN:  Yes, Your Honor.

19               THE COURT:  The last time that he had serious

20    court involvement back in 2018 [sic] before he went away for

21    10 years, he jumped.  They had a capias issued on him.

22               ATTORNEY LUSKIN:  That was in 2009, I believe,

23    Your Honor.

24               THE COURT:  You're correct, 11/25/2009.  He

25    was arrested in -- you're right, I'm sorry, 2009, not 2008.

1          That was the last time that he had a case before he

2     went away for 10 years, right?

3                    ATTORNEY LUSKIN:  That's correct.

4                    THE COURT:  So my looking at his history is

5     when he gets a case, he absents himself.

6                    ATTORNEY LUSKIN:  Well, Judge, I will argue

7     with all due respect that when he caught this case, he

8     appeared at every one of the proceedings with his attorney

9     at that time, Bryan Carr, and he was at court that morning

10    for a hearing.  And if he was going to run away, as the

11    State indicates -- or the Government indicates in their

12    memorandum, he would have long -- you know, he had the

13    resources to go, but he didn't.  He showed up in court and

14    was arrested in the clerk's -- outside the clerk's office at

15    that particular point in time.

16          And as a result of that, I would argue that --

17                    THE COURT:  Hold on.

18          We have a problem?

19                    THE DEFENDANT:  I would just like to state

20    that --

21                    THE COURT:  No, you will not say anything.

22                    THE DEFENDANT:  Oh, I'm sorry.  I apologize.

23                    THE COURT:  I was talking to the officer

24    behind you.

25                    UNIDENTIFIED SPEAKER:  Judge, may I have a

1     moment?

2                         THE COURT:  Do you have a problem?

3                         (Off-the-record discussion.)

4                         THE COURT:  Anything further, Mr. Luskin?

5                         ATTORNEY LUSKIN:  Yes, Your Honor.

6          At this particular point in time, the indications are

7     is he is not a flight risk.  He will appear at each and

8     every one.

9          I would also ask not only with a TAD monitor that

10    would monitor any type of alcohol abuse, along with drug

11    testing, as well as getting a mental health assessment at

12    this particular point in time to address his alcoholism at

13    that particular point in time, and it will allow the

14    Court -- with a GPS monitor -- he will be with Ms. Siebert

15    who is present in the courtroom today at home.

16         But his employment could be reinstated once he gets

17    the help he needs.  His boss will take him back.  I've had

18    conversations with him with respect to that, and he'd have

19    that job back.  He was one of their top employees until he

20    ran into this issue of for whatever reason picking up that

21    first drink after so many years.  That was the catalyst

22    behind this.

23         And again, as I've indicated, I think that a number of

24    the factors that are present in 3142 could be presumed with

25    respect to allowing him not to be detained and allowing him

1      to go out and demonstrate that he will remain sober, not use

2      the drugs, get the confidence of his employer back and get

3      his job back, address these issues with respect to that, and

4      answer these things as he's always done.

5           He's never run.

6                THE COURT:  I have to tell you, I'm a little

7      concerned with your client's behavior during today's

8      proceeding.

9                ATTORNEY LUSKIN:  Yes, Your Honor.

10               THE COURT:  On several occasions he has

11     interrupted the Court.  He's interrupted his lawyer.  He was

12     chastised by the two marshals in the room not to gesture to

13     people in the audience.  You had a very unfortunate

14     conversation with him that I think everyone in the Court

15     heard where voices were raised.  I'm concerned.

16          You indicated that there was someone in the courtroom,

17     a woman in the back.  Is that person -- Mr. Luskin?

18               ATTORNEY LUSKIN:  Yes, Your Honor.

19               THE COURT:  Is that person being offered as a

20     guardian or no?

21               ATTORNEY LUSKIN:  She is being offered as a

22     guardian, Your Honor.  She is a responsible person.  She

23     is --

24               THE COURT:  I don't doubt whether she's

25     responsible.  There's a legal consequence to being a

1    guardian.  Have you discussed that with her or did you just

2    volunteer her?

3                    ATTORNEY LUSKIN:  I just volunteered her.

4                    THE COURT:  Why don't you take a moment to --

5                    ATTORNEY LUSKIN:  Yes, Your Honor.

6                    THE COURT:  Because I have inquiry if in fact

7    you are offering her as a guardian.

8          White noise, please.

9                    (Off-the-record discussion.)

10                    ATTORNEY LUSKIN:  Your Honor, she will accept

11    that challenge.

12                    THE COURT:  Will you ask her to step forward,

13    please.

14                    ATTORNEY LUSKIN:  Kelly.

15                    THE COURT:  Why don't you state your name and

16    spell your last name for the record.

17                    MS. SIEBERT:  Kelly Siebert, S-I-E-B-E-R-T.

18                    THE COURT:  And you have been indicated to me

19    by Mr. Luskin that you are willing to be the guardian as it

20    relates to this defendant.  Is that correct?

21                    MS. SIEBERT:  Yes.

22                    THE COURT:  Do you understand what that means?

23                    MS. SIEBERT:  Yes.

24                    THE COURT:  What does it mean?

25                    MS. SIEBERT:  It means that if he does

1    anything that opposes what you are -- that you are giving to

2    him, that I will be also prosecuted.

3                    THE COURT:  So let me parse it out a little

4    bit.

5         So if you accept the guardianship, if in fact the

6    Court does allow him to be released on bond, you will be

7    responsible for him to appear at Court?

8                    MS. SIEBERT:  A hundred percent.

9                    THE COURT:  You will be responsible for him to

10   participate in any court-directed treatment facility or --

11                   MS. SIEBERT:  Yes.

12                   THE COURT:  -- treatment that is ordered,

13   whether it's mental health, whether it's substance abuse?

14                   MS. SIEBERT:  Yes.

15                   THE COURT:  You will make sure that the

16   home -- do you live with him?

17                   MS. SIEBERT:  Yes.

18                   THE COURT:  You'll make sure that the home has

19   no weapons?

20                   MS. SIEBERT:  Yes.

21                   THE COURT:  You'll make sure that home has no

22   illegal drugs or alcohol?

23                   MS. SIEBERT:  Yes.

24                   THE COURT:  All right.  Very well.

25        In the event that the Court does think bond is

1    appropriate, we will take it into consideration.  You will

2    be contacted by the Pretrial Services officer.

3         Thank you.  You may take your seat.

4            MS. SIEBERT:  Thank you so much.

5            THE COURT:  Anything further, Mr. Luskin?

6            ATTORNEY LUSKIN:  No, Your Honor.  Thank you

7    so much.

8            THE COURT:  Thank you.

9         The Court's going to take the matter of detention

10    under advisement.

11         The defendant will remain in the custody of the United

12    States Marshal pending further order.

13         Anything further on behalf of the United States?

14            AUSA DECKERT:  No, Your Honor.  Thank you.

15            THE COURT:  Anything further on behalf of the

16    defendant?

17            ATTORNEY LUSKIN:  No, Your Honor.

18            THE COURT:  We are adjourned.

19            (Proceedings adjourned at 2:34 p.m.)

20               * * * * *

            **C E R T I F I C A T E**

21

       I certify that the foregoing is a correct transcript

22    of the record of proceedings in the above-entitled matter.

     This transcript was prepared to the best of my ability from

23    a digital audio recording of the proceedings provided by the

     Court.

24

       */s/ Lance A. Boardman*           *December 30, 2023*

25       Lance A. Boardman, RDR, CRR         DATE